Phillip G. MONTOYA, Plaintiff,

v.

Harold ANDERSON, Secretary of the Air Force and HQ NORAD/ADCOM 4600 ABW, Peterson AFB, Colorado, Defendants.

Civ. A. No. 78–C–1346.

United States District Court, D. Colorado.

April 2, 1981.

Remigio Pete Reyes, Denver, Colo., for plaintiff.

Nancy E. Rice, Asst. U. S. Atty., Denver, Colo., for defendants.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER

CARRIGAN, District Judge.

This action was filed pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq.*, as amended. Plaintiff Phillip G. Montoya claims that the defendant, Headquarters North American Defense of the United States Air Force, thrice denied him promotions because of his Spanish-American heritage. Defendant is subject to the Act under 42 U.S.C. § 2000e–16.

The case was originally filed as a class action. On July 29, 1980, however, it was ordered that the matter proceed on Montoya's individual claim and the issue of class action status was reserved.

## I. BACKGROUND FACTS.

Plaintiff is a Spanish-surnamed citizen of the United States. His educational background includes bachelor of science degrees in electrical engineering and accounting. Additionally, he has taken engineering and management courses throughout his professional career. He began his employment with the United States Air Force in 1966 as a GS–11 Electrical Engineer at HQ NORAD/ADCOM in Colorado Springs, and was soon promoted to General Engineer in the Requirements Division, a GS–12 position.

In 1972, foreseeing no opportunity for near term promotion at the Colorado Springs base, Montoya accepted a tour of duty in Germany where he held the GS–13 position of Electrical Engineer in the Requirements Division. He remained in that position until May 1973, at which time the headquarters was transferred to another location and Montoya returned to his former position in Colorado Springs. He remained at his GS–12 General Engineer position in Colorado Springs until September 1974. Then, because of frustration in seeking a GS–13 position at HQ NORAD/ADCOM, he went back to Europe in order to obtain such a position. After spending three more years in Europe, Montoya decided to come back to this country, and at this time he encountered the alleged discrimination which gave rise to this action.

In February 1977, the plaintiff sent notice from Europe to HQ NORAD/ADCOM in Colorado Springs that he would be returning. He requested his return rights which entitled him to his former GS–12 position and a spot in the Priority Placement Program.[1] In April 1977 there was a GS–13 opening as Chief of Requirements at the Colorado Springs agency. Montoya, although apparently qualified, was not considered for the position, and it later was filled by an Anglo.

In September 1977, Montoya applied for another GS–13 position, this time as supervisor of the Joint Surveillance System. Again Montoya did not receive the position, and again an Anglo was placed on the job.

In the spring of 1978, Montoya applied for a job as Chief of the Construction Division. He was qualified for this position under the original job description, but after he submitted his application the requirements for the job were changed, thereby technically disqualifying him.

At the time of trial the plaintiff was still employed in a GS–12 position at HQ NORAD/ADCOM in Colorado Springs.[2]

## II. ANALYSIS OF PLAINTIFF'S CLAIMS.

■ To recover on his claim for disparate treatment the plaintiff must establish a *prima facie* case showing: (1) that he belongs to an ethnic minority group, (2) that he applied and was qualified for a job

---

1. As a recruitment incentive for overseas duty the Merit Promotion Plan enables returnees from European tours of duty to be given priority consideration for promotion, which in the plaintiff's case would be to a GS–13 position.

2. Until August 1979, however, he continued to be compensated at the GS–13 level.

which was open, (3) that despite his qualifications he was rejected, and (4) that after his rejection a non-minority person was selected for the job. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973), *Thornton v. Coffey,* 618 F.2d 686, 690 (10th Cir. 1980). Once the *prima facie* case is established, the defendant must clearly set forth a legally sufficient reason to justify the rejection. *Texas Department of Community Affairs v. Burdine,* —— U.S. ——, ——, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981); Thornton, supra 618 F.2d at 690. The justification must be reasonably related to objective management goals. *Furnco Construction Corp. v. Waters,* 438 U.S. 567, 577, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978); *Rich v. Martin Marietta Corp.,* 522 F.2d 333, 347 (10th Cir. 1975).

■ The plaintiff then has the opportunity to demonstrate that the proffered explanation is merely pretextual by persuading the Court that the employer was more likely than not motivated by discriminatory reasons or that the evidence offered in support of the employer's explanation lacks credibility. *Burdine, supra* —— U.S. at ——, 101 S.Ct. at 1093. The plaintiff need not prove that he was the person most qualified for the promotion. *Martin Marietta, supra* 522 F.2d at 347.

An analysis of the three situations in which Montoya sought and was denied promotions subsequently awarded to Anglos indicates that Montoya was the victim of unlawful discrimination. In each instance Montoya established a *prima facie* case and demonstrated that the defendant's proffered explanation was pretextual.

### A. *Chief of Requirements Position.*

When he was preparing to return to the United States in the spring of 1977, Montoya notified the appropriate office in Colorado Springs that he would be returning. At that time he requested Priority Placement Status, thereby entitling him to first consideration for any GS–13 positions which might become available. When the position of Chief of Requirements opened in April 1977, however, the plaintiff was not even considered for the job. This was admitted in the testimony of Colonel Rubenstein, the person responsible for filling the position.

The only explanations offered by the defendant in attempting to rebut Montoya's contention of discrimination in denying him this position (for which he was qualified and which later was awarded to an Anglo) were: (1) that the defendant was unaware of Montoya's interest in the job, and (2) that the position had been filled by a lateral transfer because it was uncertain whether the former Chief of Requirements would be returning. These stated explanations, however, were merely pretextual, and therefore legally insufficient.

First, the agency received notice on February 7, 1977, that the plaintiff would be returning to Colorado Springs and was requesting priority status for any GS–13 openings. Additionally, the plaintiff telephoned the direct supervisor of the Requirements Division, timely expressing his interest in the Chief of Requirements position, and asking that he be considered for the job.

Defendant's second explanation also lacked credibility. While the defendant claimed to prefer a lateral transfer to hiring someone from outside the division, a new employee was hired to fill the vacancy created by the lateral transfer. Finally, testimony was offered by the former Chief of Requirements stating that Montoya, who previously had worked under him, was far more qualified for the position than the Anglo who was appointed.

### B. *Joint Surveillance Systems Supervisor.*

When the plaintiff learned that the position of Joint Surveillance Systems Supervisor was to open, he met with the person then holding that job and with Colonel Rubenstein, who was to select the person to fill the position. At that time the plaintiff asked to be considered for the position. As in the case of the Chief of Requirements opening, no formal announcement of the job ever appeared, and no written criteria were used to screen or rank applicants. In fact, there was testimony that the person-

nel files were not even reviewed. Again, in spite of his Priority Placement status, Montoya did not receive the position. No satisfactory explanation was offered by Colonel Rubenstein to justify the appointment he made or the procedures he followed. Those procedures had the effect, if not the purpose, of entirely foreclosing this employment advancement opportunity to all but those few candidates personally favored by Rubenstein. In essence, the position was thus reduced to one subject to his personal patronage.

C. *Chief of Construction Division Position*

When the Chief of Construction Division position opened, it appeared to be one for which Montoya was eminently qualified. The original job description was for a General Engineer, and for the previous ten years the position had been filled by a General Engineer. The responsibilities and duties were very similar to those Montoya had performed in Europe. However, after he submitted his application, Montoya was notified that he would not be considered for the position because the job requirements had been changed. Applicants were now required to have a degree in civil engineering, even though the duties and responsibilities of the job remained unchanged. Since the plaintiff's degree was in electrical engineering instead of civil engineering, he was disqualified from further consideration.

At trial most of the witnesses testified that they did not know why the job description had been changed. One proffered explanation was that the change had occurred because the persons supervised were civil engineers, but it was never explained why this had not been significant in the past. This change in qualifications was a mere pretext.

D. *General Pattern.*

Discrimination in employment is usually subtle. As a result, isolated instances when viewed separately may not appear discriminatory at first glance. However, when viewed together a definite pattern of discrimination may be seen. Therefore, even if any one of the defendant's attempted justifications for denying the plaintiff a promotion had seemed plausible, when the three situations are considered in the context of the overall pattern of treatment afforded the plaintiff, the weight of the evidence heavily favors the plaintiff. Indeed, the Court finds that the defendant's explanations are incredible. They constitute a mere veneer of pretext attempting to cover the rather obvious discrimination which continually rebuffed the plaintiff's efforts to advance his career at a normal rate.

Unrebutted evidence indicated that there were no minorities above the GS–12 level at HQ NORAD/ADCOM. Plaintiff knew of only two minority persons besides himself who had even reached the GS–12 level. While those statistics alone do not prove the plaintiff's case, they certainly corroborate his evidence and undermine the defendant's attempts to justify the actions taken. *Muller v. United States Steel Corp.*, 509 F.2d 923, 927 (10th Cir. 1975); *Jones v. Lee Way Motor Freight, Inc.*, 431 F.2d 245, 247 (10th Cir. 1970). Indeed, there seems to have been a firm barrier to advancement of Spanish-surnamed employees beyond the GS–12 level.

Additionally, the defendant's promotion procedures were totally lacking in objective standards and fair access. Instead of publicly advertising the jobs as normally required, promotion decisions were made by supervisory personnel on such vague bases as the belief that "a person would do a good job." Clearly, insiders who are already well known to the appointing authority have an untoward advantage in such a system, and that advantage may be totally unrelated to their qualifications, or lack of qualifications, for the job. The use of such subjective standards only serves to encourage discrimination and perpetuate an "old boys club" attitude. *Muller, supra* 509 F.2d at 927–28.

In summary, the defendant failed to articulate clearly any legally sufficient reason for its failure to promote the plaintiff. This, coupled with the lack of objective

standards and fair promotion procedures and the total absence of minority employees in upper level positions, leads inescapably to the conclusion that the defendant discriminated against the plaintiff because of his Spanish-American heritage.

## III. RELIEF.

 Having established that his failure to obtain a promotion from his GS–12 position to one at the GS–13 level resulted from discrimination based on his national origin, Montoya is entitled to an award of back pay. His damages are to be measured by the difference between the amount he actually received and that which he would have received had he been promoted to Chief of the Requirements Division. *Muller, supra* at 930. Plaintiff is also entitled to front pay for the time it will take him to obtain a position equivalent to the ones he was denied. *White v. Carolina Paperboard Corp.,* 564 F.2d 1073, 1087 (4th Cir. 1977). Since Montoya continued to receive compensation at the GS–13 rate for two years following his return from Germany, the damages began to accrue in August 1979, and will terminate upon the plaintiff's obtaining a permanent promotion to the GS–13 level.

Montoya is also entitled to reasonable attorney's fees. *See* 42 U.S.C. § 2000e–5(k).

## IV. ORDER.

Accordingly, it is

ORDERED that the Clerk enter judgment for the plaintiff on his claim under Title VII, 42 U.S.C. § 2000e–5. The plaintiff shall file his claim for attorney's fees within twenty days from the entry of this Order. The defendant may file its objections within ten days thereafter. If a hearing is required, it will be scheduled promptly upon request.

IT IS FURTHER ORDERED that the parties confer within ten days following the date of this Order to attempt to reach an agreement on the proper amount of the back pay award. If no agreement can be reached, the Court will consider appropriate motions as soon as they can be heard on a short notice, priority basis. The Clerk shall withhold entry of final judgment until after the awards of attorney's fees and back pay are determined.