Nancy FADHL, Plaintiff,

v.

**POLICE DEPARTMENT OF the CITY AND COUNTY OF SAN FRANCISCO, Defendant.**

**No. C 79–2119 TEH.**

United States District Court, N.D. California.

Sept. 2, 1982.

Laura Stevens, Willdorf & Stevens, San Francisco, Cal., Guy T. Saperstein, Farnsworth, Saperstein & Brand, Oakland, Cal., for plaintiff.

Vicki L. Hobel, Deputy City Atty., San Francisco, Cal., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

THELTON E. HENDERSON, District Judge.

This case concerning sex discrimination was brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* Trial to the Court commenced on March 9, 1982, and post-trial briefs on issues related to statistical evidence were submitted on June 11, 1982. Based on the evidence presented at trial and on the controlling legal authorities, and pursuant to Fed.R.Civ.P. 52(a), the Court makes the following Findings of Fact and Conclusions of law.

## FINDINGS OF FACT

1. This suit was commenced on August 13, 1979 by Nancy Fadhl against the Police Department of the City and County of San Francisco (hereinafter "Police Department"), pursuant to Title VII of the Civil Rights Act of 1964, as amended. Plaintiff Fadhl is a woman who alleges that she was terminated from employment with the San Francisco Police Department because of her sex.

2. The San Francisco Police Department is an agency of the City and County of San Francisco and is an employer within the meaning of § 701(b) of Title VII of the Civil Rights Act of 1964, as amended.

3. Ms. Fadhl was hired by the Police Department to be a Q–2 police officer in January, 1978.

a. Prior to her 1978 employment with the Police Department, plaintiff received an Associate of Arts degree in criminology in preparation for her anticipated employment as a police officer.

b. Ms. Fadhl satisfactorily completed the police academy portion of her training in April, 1978 as a member of the 130th Recruit Class of the Police Department.

c. Of forty-nine (49) recruits in the 130th Recruit Class, two (2), including the plaintiff, were female.

4. Following completion of her police academy training, the plaintiff entered the Field Training Program (hereinafter "F.T.O. Program") in May, 1978.

a. In 1978, the F.T.O. Program was a fourteen (14) week training program which all recruits were required to pass in order to be retained by the Police Department as Q–2 Officers.

b. During the course of the F.T.O. Program, the recruit is trained and evaluated by a series of training officers and sergeants. The recruit's skills are evaluated in thirty (30) performance categories, which are sub-divided under the headings of "Appearance," "Attitude," "Knowledge," "Per-

formance," and "Relationships." In each of the thirty categories, the recruit is graded on a scale from one (1) to seven (7), with a grade of four (4) representing the minimum acceptable grade.

c. A Field Training Officer (hereinafter "F.T.O.") responsible for the day-to-day training and evaluation of the recruit completes a Daily Observation Report (hereinafter "D.O.R."). For each of the performance categories in which the F.T.O. actually observes the recruit's conduct on a given day, a grade on the one-to-seven scale is recorded on the D.O.R. The F.T.O. also records, in narrative form, the recruit's most acceptable and least acceptable performance of the day, as well as any additional comments. Alternate Week Evaluation Session forms (hereinafter "A.W.E.S.") are also completed by the assigned F.T.O., who records the significant strengths and weaknesses of the recruit, as well as optional comments.

d. Each F.T.O. is supervised by a Field Training Sergeant. The Field Training Sergeant, in addition to training and evaluating the recruit, completes a Supervisor's Weekly Training Report (hereinafter "S.W.T.R.") on which the recruit's average grade for the week in each performance category is recorded.

5. During her participation in the F.T.O. Program, plaintiff Fadhl rotated among the following regularly assigned F.T.O.'s and Field Training Sergeants: from the eighth through the twenty-eighth day of the Program, Officer Harlan Wilson and Sergeant Philip Dunnigan; from the twenty-ninth through the fifty-sixth day of the Program, Officer Mike McNeill and Sergeant Robert Berry; beginning on the fifty-seventh day of the Program, officer James Hall and Sergeant David Dugger. None of the Police Department employees who trained recruits in the program during plaintiff's participation was female.

6. On the sixty-ninth day of the F.T.O. Program, Ms. Fadhl was relieved of field duty, placed on station duty, and recommended for termination on the basis of unsatisfactory field performance. Plain-

tiff's employment with the defendant terminated on October 20, 1978.

7. The guidelines upon which plaintiff's F.T.O.'s and Field Training Sergeants based their evaluations of Ms. Fadhl's job performance were subjective. Though the numerical grades given to the plaintiff on her D.O.R.'s and S.W.T.R.'s were designed to convey an objective assessment of Ms. Fadhl's performance, it is clear from the evaluation guidelines themselves, as well as from the evidence of their application, that the grades given are subject to the judgment of the person conducting the evaluation. As a result, the numerical grades received by the plaintiff were often inconsistent with either the guidelines themselves or with the training officer's narrative description of Ms. Fadhl's performance. For example, Officer Wilson's description of Ms. Fadhl's most acceptable performance of the day on D.O.R. 22 characterizes that performance as "flawless," yet the grades given in the applicable performance categories are all fours (4's), indicating minimally acceptable performance. The discrepancy between plaintiff's performance and the scores for her performance bears out the testimony, given either at trial or in deposition by several of the police officers who trained the plaintiff during the F.T.O. Program, concerning the potential for subjective grading inherent in the evaluation system used in the Program.

8. The F.T.O.'s and Field Training Sergeants who trained and evaluated the plaintiff did not apply the evaluation guidelines to Ms. Fadhl's performance in the same manner as they applied the guidelines to the performance of male recruits. The guidelines were applied less favorably to Ms. Fadhl than to male recruits. Male recruits, unlike plaintiff, received scores higher than those called for by the evaluation guidelines, including acceptable scores where unacceptable scores were called for. *Compare* to Plaintiff's Exhibit 19 (Evaluation Guidelines), *e.g.*, Plaintiff's Exhibits 34 and 37 prepared for male recruits by Officer Hall; Plaintiff's Exhibits 60 and 62, prepared for male recruits by Officer

McNeill; Plaintiff's Exhibits 65 and 67 prepared for a male recruit by Officer Wilson.

9. The recommendation to terminate the plaintiff, and her resulting termination, were based principally on evaluation of Ms. Fadhl's performance as documented in her D.O.R.'s. Though the Police Department presented testimony that Ms. Fadhl's overall performance, not simply the D.O.R.'s, were relied upon in terminating the plaintiff, this testimony is completely contradicted by the administrative record of the proceedings leading to termination. That record clearly shows the heavy reliance placed by the defendant on events documented and evaluated in the D.O.R.'s. The assessments contained in the D.O.R.'s reflect the less favorable application to the plaintiff's performance of subjective guidelines applied by the same F.T.O.'s and Field Training Sergeants to male recruits. *See* Finding of Fact 8., *supra.* This evidence supports the inference that the plaintiff's termination was in fact based on her sex.

10. The statistical evidence submitted by the plaintiff, while unnecessary to establish Ms. Fadhl's *prima facie* case of sex discrimination, lends support to Ms. Fadhl's evidence of disparate treatment.

a. Plaintiff's expert testified that he compared, for the years 1977 to 1980, the percentage of all Police Department recruits, by sex, to the percentage of all recruits, by sex, separated from the Police Department, either through termination or resignation. Based on these percentages, the expert testified that the percentage of females separated from the Department was 4.65 standard deviations higher than the average percentage of separations for all recruits. From this, the expert concluded that the selection of separated recruits cannot be hypothesized to be independent of the sex of the recruit.

b. The defendant sought to undermine this statistical evidence by showing that some of those who were treated by the plaintiff's expert as "separated" from the Police Department had in fact "voluntarily resigned" and therefore could not be considered in a statistical analysis such as the one conducted by plaintiff's expert. According to the defendant, exclusion from the statistical analysis of those who voluntarily resigned from the Police Department would reduce the number, and thus the percentage, of all recruits separated. This in turn would reduce the number of standard deviations between the percentage of females separated, which would remain the same, and the percentage of all recruits separated, thus weakening the conclusion drawn by plaintiff's expert.

As plaintiff's examination of defense witnesses revealed, however, the documentary evidence relied upon by the defendant in support of this argument, Plaintiff's Exhibit 71, reflects some errors by the Police Department in allocating individuals to the category of "voluntarily resigned." The defendant thus seeks to use unreliable data to refute the reliability of plaintiff's statistical evidence. Though defendant's evidence raises questions about the reliability of plaintiff's statistical case, it cannot be concluded, in light of the weaknesses in defendant's evidence, that plaintiff's expert testimony is entitled to no weight whatsoever.

c. Defendant's own statistical analysis does demonstrate, however, that movement of a few recruits from one category, e.g., "Resigned, Service Satisfactory," to another, e.g., "Resigned, Service Unsatisfactory," can change the standard deviation results— and thus the outcome with respect to statistical significance—when the sample on which the statistical analysis is based is as small as the one in this case. The statistical evidence here, therefore, does not, standing alone, constitute a *prima facie* case of discrimination, though it reinforces the inference of discrimination drawn by the Court from the plaintiff's other evidence.

11. Defendant's stated reason for terminating the plaintiff was Ms. Fadhl's failure to perform at a consistently acceptable level in various categories among the thirty in which recruit officers are evaluated. In addition to Ms. Fadhl's D.O.R.'s, defendant produced the testimony of the plaintiff's F.T.O.'s and Field Training Sergeants to

show that Ms. Fadhl was terminated because of her inability to perform consistently at acceptable levels in critical areas where an error could result in injury or damage. Specifically, evidence was presented that the plaintiff's performance was unacceptable in the areas of driving skill under normal and stress conditions, field performance under stress conditions, officer safety, use of physical skill to control conflict, and use of common sense and good judgment.

12. Plaintiff has demonstrated that her inability to perform was not the true reason for her termination, and that she has been the victim of intentional discrimination because of her sex. That the Police Department's proferred reason for plaintiff's termination is pretext for intentional discrimination is shown by the following facts:

a. Officers Wilson, McNeill, and Hall, who were the plaintiff's regularly assigned F.T.O.'s, evaluated male recruits in the critical areas where plaintiff's performance was claimed to be unacceptable and gave Ms. Fadhl less favorable evaluations for similar or superior performances. Men whose performance was more egregious than plaintiff's received D.O.R. scores at least as good as, and often better than those given to Ms. Fadhl. *Compare, e.g.,* Plaintiff's Exhibit 33, category 20 (Officer Safety) and Plaintiff's Exhibit 38, category 9 (Driving Skill: Normal Conditions)—both D.O.R.'s prepared for male recruits by Officer Hall—to Ms. Fadhl's D.O.R. for day 59, categories 19 and 20 (Officer Safety) and for day 63, category 9 (Driving Skills, Normal Conditions), respectively. Similar errors in performance resulted in greater score reductions for the plaintiff than for male recruits. *Compare, e.g.,* Plaintiff's Exhibit 59, categories 17, 20, and 21 (Field Performance and Officer Safety), D.O.R.'s prepared for male recruits by Officer McNeill, to Ms. Fadhl's D.O.R. for day 42, same categories, particularly in relationship to descriptions of conduct being evaluated.

Officer Hughes, who was also assigned to the plaintiff as an F.T.O. during the Program, gave male recruits acceptable scores for performances described as unacceptable by the evaluation guidelines. *Compare, e.g.,* plaintiff's Exhibit 19 (Officer Safety) and Plaintiff's Exhibit 49, Officer Safety categories, particularly in relationship to descriptions of conduct being evaluated. Plaintiff was not similarly treated.

At trial, several of plaintiff's training officers testified to events or circumstances not reflected in the narrative portions of Ms. Fadhl's written evaluations in an effort to explain the scores given to plaintiff's performance. For example, Field Training Sergeant Berry testified to observations he made of Ms. Fadhl's daily performance on days 35, 36, and 44 of the F.T.O. Program, observations not recorded on D.O.R.'s or S.W.T.R.'s by Sergeant Berry. Such post-hoc explanations and rationalizations of Ms. Fadhl's treatment while a recruit are entitled to little or no weight in light of the credibility of plaintiff's testimony concerning her experiences and in light of the defendant's policy, testified to by Sergeant Berry, among others, of thorough contemporaneous documentation of recruit performance.

b. Several of the officers involved in the graining and evaluation of the plaintiff expressed a bias against female police officers.

1) F.T.O. Wilson described the plaintiff, in A.W.E.S. 4 as "too much like a woman," and his testimony at trial in no way refuted the obvious inference to be drawn from this statement that being a successful police officer requires, at some level, not being female.

2) Field Training Sergeant Dunnigan, criticizing plaintiff's "police attitude" in S.W.T.R. 4, stated that, "After work she can become feminine again." At trial, Sergeant Dunnigan testified that he meant that, after work, plaintiff could become a civilian again, that she could abandon the "officer bearing" required to be a police officer. Rather than remove the logical inference of his statement in S.W.T.R. 4, this testimony indicates that, to Sergeant Dunnigan, being "feminine" is inconsistent with being a police officer, just as being a

civilian is inconsistent with being a police officer, because neither females nor civilians can command the requisite officer bearing.

3) F.T.O. McNeill, in A.W.E.S. 6, described Ms. Fadhl as "very ladylike at all times, which in the future may cause problems," and told plaintiff at one point not to cross her legs because it made her look "too much like a lady." As Officer McNeill's testimony at trial revealed, the concern underlying these statements was officer safety. By referring to the plaintiff as "ladylike," rather than unsafe, F.T.O. McNeill communicated to Ms. Fadhl, as to the Court, his belief that women police officers are not safe police officers.

c. As shown by plaintiff's evidence as well as by other litigation in this District concerning sex discriminatory practices of the defendant, see Officers for Justice, et al. v. Civil Service Commission, 473 F.Supp. 801 (N.D.Cal.1979) (consent decree approved), the general policies and overall record of the Police Department reflect an atmosphere of sex discrimination that both pre-dates and post-dates plaintiff Fadhl's experiences at the Police Department. No effective mechanism for screening out of participation as F.T.O.'s and Field Training Sergeants individuals biased against women was employed by the Department.

d. Plaintiff Fadhl, as well as other women who testified on her behalf, frequently received conflicting instructions from their F.T.O.'s concerning the definition of acceptable performance in the areas deemed by the Police Department to be critical to plaintiff's termination. For example, on her D.O.R. 22, Ms. Fadhl received a score of 2 in category 20, Officer Safety, for placing a non-violent misdemeanor suspect in a patrol car without handcuffing him, though plaintiff's undisputed testimony at trial was that she was taught at the Police Academy that she had discretion in deciding whether to place handcuffs on non-violent non-felons. "Mixed messages" like this one made it difficult if not impossible for the plaintiff to know what was expected of her and to perform accordingly.

e. As defense witnesses involved with the F.T.O. Program testified, positive feedback from training officers and sergeants is important to a recruit's successful completion of the Program. Though the evidence shows that plaintiff's F.T.O.'s gave positive reinforcement to recruits, the plaintiff testified and the evidence supports the conclusion that Ms. Fadhl did not receive the treatment deemed by the defendant to be important to success. Performances by plaintiff that were described in superlative terms received minimally acceptable scores, and verbal positive reinforcement was not given to Ms. Fadhl.

Furthermore, the plaintiff testified and the Court finds, despite the contrary testimony of F.T.O. Hughes, that Officer Hughes implied that Ms. Fadhl could receive a good performance evaluation if she granted him sexual favors. Such conduct is entirely inconsistent with the support acknowledged by the defendant to be important to successful completion of the F.T.O. Program.

f. Testimony from female officers trained by Ms. Fadhl's F.T.O.'s and Field Training Sergeants that these training officers were not hostile to them as women but were in fact supportive of their efforts as trainee recruits is not persuasive that these officers were not hostile to the plaintiff because she is female. The female officers who testified for the defendant were indeed a very impressive group. However, the fact that such outstanding women succeeded in the F.T.O. Program under the tutelage of plaintiff's training officers reinforces rather than undermines the inference that must be drawn from plaintiff's evidence, i.e., that the plaintiff, because she is a woman, was subjected to a higher standard of performance than were male recruits.

13. An administrative hearing was conducted by the Police Department to determine the propriety of the plaintiff's termination, but the possibility that sex discrimination was at work in the events that led to the recommendation for termination was not developed at that hearing. Though Ms.

Fadhl was represented at the hearing, she was not present when it occurred, nor were witnesses called on her behalf. The defendant proved that the possibility of sex discrimination was presented at the hearing by reference to comments about the plaintiff's sex that appear on her evaluation forms. The finder of fact at the hearing, former Chief of Police Charles Gain, testified at trial that he considered and totally discounted the possibility of sex discrimination in reaching his decision. However, no evidence of the discriminatory application of subjective evaluation . guidelines was presented or developed at the hearing. In light of the testimony at trial and the nature of the evidence presented at the administrative hearing, it cannot be concluded that Ms. Fadhl was given a full hearing by the Department at the time of her termination because no investigation of plaintiff's claim of sex discrimination was conducted in connection with the termination hearing.

14. Plaintiff's uncontroverted evidence of the pay that she would have received had she not been terminated by the defendant, less income actually earned, is as follows:

    a.  For the year 1978, $3,400.00;

    b.  For the year 1979, $15,200.00;

    c.  For the year 1980, $20,000.00;

    d.  For the year 1981, $10,000.00;

    e.  For the year 1982, through the month of August, $9,280.00.

The total amount that Ms. Fadhl would have been paid had she not been terminated, less income actually earned, is $57,880.00.

15. Plaintiff's evidence establishes that her current annual salary would have been $27,000.00 at the Police Department had she not been wrongfully terminated, and that her current annualized monthly earnings total $13,920.00.

16. To the extent that any of the following Conclusions of Law are deemed Findings of Fact, they are incorporated herein by reference.

## CONCLUSIONS OF LAW

1. To the extent that any of the foregoing Findings of Fact are deemed Conclusions of Law, they are incorporated herein by reference.

2. This Court has jurisdiction of plaintiff's discharge claim pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.*

■ 3. The burden of establishing a *prima facie* case of disparate treatment based on sex is not an onerous one. *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981). Plaintiff Nancy Fadhl has met that burden by proving, by a preponderance of the evidence, that she is a member of a protected class, that she was discharged from employment, and that the circumstances of her discharge give rise to an inference of unlawful discrimination. *See McDonnell Douglas Corporation v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). *See also Taylor v. Teletype Corp.,* 648 F.2d 1129, 1135 (8th Cir.), *cert. denied,* 454 U.S. 969, 102 S.Ct. 515, 70 L.Ed.2d 386 (1981) (relevant evidence re *prima facie* case).

■ 4. Defendant rebutted the presumption of discrimination that arose upon plaintiff's establishment of a *prima facie* case by producing evidence raising a genuine issue of fact as to whether the Police Department discriminated against the plaintiff or whether, instead, Ms. Fadhl was terminated for a legitimate, nondiscriminatory reason. *Texas Department of Community Affairs v. Burdine, supra,* 450 U.S. 248, 101 S.Ct. at 1094, 67 L.Ed.2d 207.

■ 5. The plaintiff has met her ultimate burden of persuasion that she has been the victim of intentional discrimination by showing that the defendant's proffered explanation for her termination was pretext. *Id.* at 1095. The preponderance of the evidence shows that Ms. Fadhl was held to a more stringent standard of performance because she is a woman and thus that her sex was a significant factor in her termination. *See Whiting v. Jackson State University,* 616 F.2d 116, 121 (5th Cir.1980).

6. Plaintiff is entitled to a final judgment against defendant in the amount of $57,880.00, reflecting pay that Ms. Fadhl would have received but for her wrongful termination by defendant, less income actually earned since the termination. Plaintiff shall also receive interest on this back pay amount, calculated from the end of each calendar quarter, on the amount then due and owing, at ninety percent (90%) of the average prime rate for the year in which the calendar quarter occurs. *Richardson v. Restaurant Marketing Associates, Inc.,* 527 F.Supp. 690, 698 (N.D.Cal.1981).

The applicable average prime rate figures, as obtained from the Federal Reserve Bank, are as follows: for 1978, 9.06%; for 1979, 12.67%; for 1980, 15.27%; for 1981, 18.87%. Interest for periods during calendar year 1982 shall be at 90% of the 15.75% average prime rate for January, 1982.

7. Plaintiff is entitled to a final judgment against defendant for the additional sum of $14,080.00 per year as front pay for a period of two years, to enable plaintiff to acquire an education equal to that which she acquired in preparation for her employment by defendant, for a total of $28,160.00. *See Fitzgerald v. Sirloin Stockade,* 624 F.2d 945, 957–58, 22 Fair Emp. Prac.Cas. 262, 269–70 (10th Cir.1980); *Montoya v. Anderson,* 511 F.Supp. 523, 527, 27 Fair Emp.Prac.Cas. 210, 214–15 (D.Colo. 1981). This figure represents the difference between what the plaintiff would have earned at the Police Department and her annualized earnings in her current job. An award of front pay is appropriate in a case such as this one where reinstatement is an inappropriate remedy because the antagonism generated by the litigation prohibits the re-establishment of an effective employment relationship. *See E.E.O.C. v. Pacific Press Pub. Ass'n.,* 482 F.Supp. 1291, 1320 (N.D.Cal.1979).

8. Plaintiff is entitled to her costs of suit, including all reasonable attorneys' fees for representation in this case.