[Civ. No. 17506. First Dist., Div. Two. Oct. 14, 1957.]

JOSEPH ONICK et al., Appellants, v. JAMES N. LONG, as Sheriff, etc., et al., Respondents.

Lew M. Warden, Jr., for Appellants.

Edmund G. Brown, Attorney General, Herbert E. Wenig, Assistant Attorney General, Robert L. Bergman, Deputy Attorney General, Francis W. Collins, District Attorney (Contra Costa), Rudd Sellar, Deputy District Attorney, Hancock, Elkington & Rothert and Harlow P. Rothert for Respondents.

DOOLING, J.—The seven appellants joined with 14 others as plaintiffs. They appeal from judgment of nonsuit entered against them. The appeal is presented on a settled statement. The defendants are James Long, sheriff of Contra Costa County; Ray Stoffels, deputy sheriff; E. F. Phipps, chief of police of the city of Richmond; W. E. Pendergast, district liquor control administrator; and John Pippin, a liquor control officer.

Appellants, excepting Kelly, grounded their action on false arrest and false imprisonment. Kelly's action was for wrongful trespass on his place of business and damage to his business by the wrongful arrest of persons in his place of business.

The causes of action are based on a mass "raid" which was conducted under the direction of the sheriff and his deputy in North Richmond, an unincorporated area adjacent to the city of Richmond, during the course of which a large number of persons were detained for questioning and many of these were arrested, confined in the county jail and charged with the crime of vagrancy. The raid had been preceded by "numerous reports of law violations . . . in North Richmond . . . but no formal complaints against any named persons or places had been signed or filed" and none of these reports "named any of the plaintiffs as perpetrators of any law

violations. Stoffels recommended to Long that a number of law enforcement officers be organized . . . to conduct a raid on North Richmond, and advised him that he would need additional personnel . . . because there were not sufficient men in the Sheriff's force to conduct such an operation. Sheriff Long authorized Stoffels to take such action, including the obtaining of additional personnel.'' Stoffels telephoned to Pendergast and asked him to detail some liquor enforcement officers to check possible liquor law violations and Pendergast agreed and did in fact ''detail approximately 10 members of his staff, including himself, for such limited purpose.'' Stoffels also telephoned to Lieutenant Jones of the Richmond Police Department ''and requested of him that his department lend its assistance in the operation, but did not indicate the details of the operation.'' Jones ''contacted Chief Phipps by telephone at Redding, who said, ''Let's cooperate and lend them some personnel.' '' At all times until after the raid defendant Phipps was out of the city of Richmond. Jones was at no time informed of the details of the proposed operation. He detailed a number of police officers to assist.

Stoffels prepared mimeographed directions for the proposed raid in which the word ''raid'' was used to designate the operation and those conducting it were told to ''hold for interrogation all persons . . . not residents of North Richmond'' and to hold ''addicts, peddlers, prostitutes, known gamblers, persons possessing firearms, et al.'' and ''if in doubt as to whether to hold subject, it is better to hold and bring to headquarters.'' Headquarters was designated as a tavern called the 341 Club and ''all persons detained will be brought to this location for further screening prior to transportation to the County Jail, Martinez.''

On February 26 at about 9 p.m. the officers, about 100 in all, who had assembled in the City of Richmond Hall of Justice were ''briefed'' by Stoffels, ''who was in direct charge of the raid.'' They were organized into groups ''to visit the different locations to be raided.'' '' [E]ach group was under the command of a Deputy Sheriff. Lists of 'wanted persons' were distributed . . .; none of these plaintiffs was named on such lists. Inspector Stoffels testified that the officers had authority to search and were told to question everyone. No search warrants or warrants of arrest were obtained'' ''Pendergast was present at the briefing session, but Chief Phipps was not, being out of the city. . . .''

Long knew of the briefing session but was not present at it. He accompanied the raiders in an automobile with two news-papermen. "One of the reporters testified that en route Long said that the operation was to be 'a hoodlum raid . . . to clean up persons who have come in from other areas.' " Long drove to some of the raided places. He was inside the 341 Club on two occasions. Long did not personally arrest any person or direct any arrest and saw no arrests or searches "although he saw various officers bringing people into the 341 Club." Stoffels was the commander of the raiding expedition but there is no evidence that he personally arrested any of the plaintiffs. Pendergast accompanied one of the raiding parties, but there was no evidence that he personally arrested anyone.

"In the course of the raid, a large number of persons were detained and questioned by the officers, and of these, a large number were taken by the officers to the 341 Club where they were further interrogated and searched. . . . Some of the persons brought to the 341 Club were released, and others, including the plaintiffs who testified herein, were directed to remain in the back room of the 341 Club to await transportation to Martinez. Approximately 44 of said persons . . . were transported to the Contra Costa Jail in Martinez, where they were 'booked,' photographed, fingerprinted, and detained for varying periods, until they could furnish bail."

None of the appellants testified at the trial. As to appellants Mims, Jones and Onick there was testimony that they were seen that night both in the group of detained persons at the 341 Club and later at the county jail. As to appellant McFadden there was testimony that he was seen in the group of detained persons at the 341 Club but no one testified to seeing him at the jail. The only testimony as to appellant Devers is that he was seen outside of Kelly's place of business by a witness who had been arrested in Kelly's food store. There is no evidence that Nickerson was seen by any witness that evening. As to each appellant other than Kelly and Devers the clerk of the San Pablo Justice Court produced court records showing that each appeared before said court on March 1, 1954, upon a complaint of Stoffels charging vagrancy and that the case against each was later dismissed. These records also showed that appellant Nickerson pleaded guilty to a violation of the Alcoholic Beverage Control Act committed on February 26, 1954, and paid a fine of $25.

█ On appeal from a judgment of nonsuit the evidence most favorable to the plaintiff must be assumed to be true and every reasonable inference in plaintiff's favor drawn therefrom. (*Hughes* v. *Oreb*, 36 Cal.2d 854, 857 [228 P.2d 550].) As to appellants Mims, Jones and Onick we have evidence that they were seen at the 341 Club in the group of persons detained by the raiding party, that they were later that night seen at the jail, and that they were charged with vagrancy by Stoffels who led the raiding party. This testimony coupled with the testimony as to how the raiding party operated, that no warrants were issued and that after being screened at the 341 Club approximately 44 persons were arrested and transported to the jail, would reasonably support an inference that these three appellants were taken to the 341 Club, there examined and arrested and taken to the jail and charged by Stoffels with vagrancy. █ Their arrest without a warrant would establish a prima facie case of false imprisonment and place the burden on the responsible persons to justify it. (*Hughes* v. *Oreb*, *supra*, 36 Cal.2d 854, 858.)

As to the appellant McFadden the question is a closer one. He was seen in the group of persons being detained and questioned at the 341 Club and he was charged with vagrancy by Stoffels but no one testified that he was seen at the jail. We conclude however that from the fact of his being in the group at the 341 Club and the charge of vagrancy against him made by Stoffels, together with the testimony of the general procedure followed that evening it could be reasonably inferred that McFadden was arrested and taken to the county jail where he was charged with vagrancy. █ Indeed McFadden's detention at the 341 Club without a warrant or reasonable grounds to believe him guilty of crime might standing alone constitute a false imprisonment. (*Moffatt* v. *Buffums' Inc.*, 21 Cal.App.2d 371 [69 P.2d 424]; *Hanna* v. *Raphael Weill & Co.*, 90 Cal.App.2d 461 [203 P.2d 564].) █ As said in the Hanna case at page 462: "The essential thing in false imprisonment is the restraint of the person."

█ The settled statement recites: "Stoffels testified that on the evening of February 26, 1954, appellant Roscoe McFadden admitted smoking marijuana that evening, and that the Sheriff's office 'had previous arrests on him.'" From this it is argued that probable cause for McFadden's arrest was shown. The fact that McFadden had a record of previous arrests would not furnish probable cause for his arrest on the night of the raid. Whether McFadden admitted smoking

opium before or after his arrest is not shown by the record but the record states that "there was no evidence that any of these plaintiffs were personally arrested" by Stoffels. What Stoffels was told by McFadden even if it was before, and not after, his arrest, would not furnish probable cause for his arrest by another unless communicated to the one making the arrest, a matter on which the record is silent. Construing this evidence most favorably to McFadden, as we must in reviewing a judgment of nonsuit, it certainly does not compel a finding that reasonable grounds for McFadden's arrest existed.

As to appellants Devers and Nickerson there is no evidence from which the illegal arrest or imprisonment of either can reasonably be inferred.

■ The record contains ample evidence to justify holding Long and Stoffels liable for any unlawful imprisonments arising out of the raid. ■ There is nothing to justify holding Phipps liable. His only act was to authorize some of his policemen to be detailed to assist the sheriff. He had no knowledge of the unlawful character of the contemplated operation. As to Pendergast and Pippin there is no showing that they directed or authorized the raid or made or directed any arrests. Indeed the record does not mention Pippin's name. ■ As to Pendergast it shows only 1. that Pendergast detailed approximately 10 members of his staff including himself for the limited purpose of checking possible violations of the Alcoholic Beverage Control Act; 2. Pendergast was present at the briefing session; and 3. Pendergast accompanied one of the raiding parties, but it was not shown that he personally arrested anyone. His statutory power was limited to the enforcement of the liquor laws (Bus. & Prof. Code, § 25755) and there is nothing in the record to show that he or his men participated in any manner in any of the unlawful conduct or did anything beyond their statutory duty, i.e., "checking possible violations of the Alcoholic Beverage Control Act" which the record shows was the "limited purpose" for which they were present.

The case of Kelly stands on an entirely different ground. One witness, Howard, testified that he was arrested in Kelly's place of business. There was no evidence that this single arrest caused Kelly any actual damage. Kelly argues, however, that since the arrest was illegal there was at least a technical trespass, applying the principle that a legal entry may become

a trespass *ab initio* by subsequent illegal conduct. (24 Cal. Jur., Trespass, § 6, p. 663; 1 Rest., Torts, § 214.) The doctrine of trespass *ab initio* is a fiction of the early English common law, "a procedural device, 'due to the misplaced ingenuity of some medieval pleader.'" (Prosser on Torts, 2d ed., § 25, pp. 106, 107.) The Restatement of Torts requires for its application "an act . . . tortious to the possessor, or to a member of his immediate family or household." (1 Rest., Torts, § 214(2).) An action for false arrest is a personal action "which do[es] not give rise to a cause of action in anyone other than the person aggrieved." (*Coverstone* v. *Davies,* 38 Cal.2d 315, 324 [239 P.2d 876].) Since the arrest of Howard was no offense against Kelly and he was not a member of Kelly's immediate family or household the doctrine of trespass *ab initio* is not applicable.

The day after the order of nonsuit was entered against Kelly his attorney asked to reopen the case to present Kelly's testimony. No affidavit was filed in support of the request and no other showing to explain the delay in producing him was made. If Kelly had been produced and his evidence offered after the motion for nonsuit was argued and before the court acted on it the denial of such offer might well have been error. (*Eatwell* v. *Beck,* 41 Cal.2d 128 [257 P.2d 643].) But where a party has rested, and after a nonsuit has been granted on a subsequent day seeks to reopen his case, in the absence of a showing of reasonable grounds for the delay in offering the witness we are satisfied that the trial court commits no abuse of discretion in refusing to permit the reopening of the case to allow such testimony to be introduced out of order. (*Weber* v. *Marine Cooks' & Stewards' Assn.,* 93 Cal.App.2d 327, 340 [208 P.2d 1009]; 24 Cal.Jur., Trial, § 52, p. 771.)

Judgment of nonsuit in favor of defendants Long and Stoffels is reversed as to appellants Mims, Jones, Onick and McFadden. In all other respects the judgment of nonsuit is affirmed.

Kaufman, P. J., and Draper, J., concurred.