**Evelyn J. PRIEST, Plaintiff,**

v.

**George ROTARY, individually and dba Fireside Motel and Coffee Shop, Defendant.**

**No. C 81–2718 TEH.**

United States District Court, N.D. California.

Feb. 12, 1986.

Employment Law Center, Joan M. Graff, Felix Velarde-Munoz, Linda J. Krieger, San Francisco, Cal., Robert A. Zigler, Fortuna, Cal., for plaintiff.

Bruce E. McLeod, Hardin, Cook, Loper, Engel & Bergez, Oakland, Cal., for defendant.

## FINDINGS OF FACT AND
## CONCLUSIONS OF LAW

THELTON E. HENDERSON, District Judge.

### INTRODUCTION

This is an action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. section 2000e, *et seq.* (hereinafter "Title VII") and California state tort law. Plaintiff sought back pay, declaratory relief and injunctive relief against her former employer for subjecting her to sexual harassment and for terminating her employment. Additionally, plaintiff sought compensatory and exemplary damages for false imprisonment, assault and battery, and intentional infliction of emotional distress.

Trial to the Court commenced on March 6, 1984, and post-trial briefs on issues relating to damages and the credibility of witnesses were submitted on April 30, 1984. Based on the evidence presented at trial, and on the controlling legal authorities and pursuant to Federal Rule of Civil Procedure 52(a), the Court makes the following Findings of Fact and Conclusions of Law.

### FINDINGS OF FACT

1. Plaintiff Evelyn June Priest was involuntarily terminated from her employment as a waitress on June 23, 1978. She filed a charge of discrimination with the California State Department of Fair Employment and Housing on or about September 6, 1978, which referred the charge to the United States Equal Employment Opportunity Commission (EEOC) on or about the same date, and received Notice of Right to Sue from the EEOC on or about March 30, 1981. (Exhibits P–1 and P–2). This suit was commenced on June 23, 1981, against George Rotary individually and doing business as the Fireside Motel and Coffee Shoppe (hereinafter variously "Rotary," "George Rotary," or "defendant").

2. Plaintiff is a woman who alleges that she was subjected to sexual harassment and termination of employment because of her sex, and a series of common law torts, described below.

3. George Rotary, doing business as the Fireside Motel and Coffee Shoppe, was at all times relevant herein an employer within the meaning of section 701(b) of Title VII of the Civil Rights Act of 1964.

4. Plaintiff was hired by George Rotary on or about January 18, 1978, to work as a full-time cocktail waitress in the Fireside Lounge. When plaintiff was hired, she asked Rotary what she should wear as a cocktail waitress, and defendant stated he wanted her to wear "something low-cut and slinky, but he didn't want pantsuits." Plaintiff told defendant she only owned pantsuits and defendant replied that plaintiff should wear what she wanted and he would "... take a look at it."

Plaintiff reported to work on or about January 18, 1978, wearing a pantsuit; defendant said of this attire, "No, that's not going to get it." and told plaintiff she wasn't "going to work out in the cocktail lounge."

Several days later, George Rotary removed Ms. Priest from her position as a cocktail waitress in the Fireside Lounge and assigned her to work as a waitress in the Fireside Coffee Shoppe, in which assignment she wore a uniform. (Testimony of Evelyn Priest).

5. In the course of plaintiff's employment as a waitress in the Fireside Coffee Shoppe, she was subjected to unwelcome sexual harassment by defendant Rotary. During the first week of plaintiff's employment, while plaintiff was in the kitchen doing the dishes, defendant came up behind plaintiff Priest, put his arms around her waist and placed his hands on her breasts and tried to kiss her on the neck. (Testimony of Evelyn Priest). This incident was witnessed by two fellow employees, Dennis Wyckoff and "Rick." Defendant commented that he had "been trying to get to her [plaintiff] for a long time." This incident occurred shortly after plaintiff's reassignment to the Fireside Coffee Shoppe. On another occasion, defendant came up behind plaintiff as she was picking up a

tray full of orders at the pick-up station and placed his hands on her waist and breast. (Testimony of Evelyn Priest). This incident was witnessed by a nonparty witness, Rose Mariani, who corroborated plaintiff's testimony at trial. On yet another occasion, Mr. Rotary sat down beside Ms. Priest in the coffee shop and placed his hand on her leg. (Testimony of Evelyn Priest). This incident was also observed by Ms. Rose Mariani. (Testimony of Rose Mariani).

On another occasion, Mr. Rotary came up behind Ms. Priest while she was in the hallway next to the Fireside kitchen and trapped her between himself and another male employee, pressing his body against her and preventing her from being able to move away. Additionally, on numerous occasions, defendant Rotary touched plaintiff in a sexually suggestive manner either by kissing her, putting his arm around her, rubbing his body against hers, unzipping the front of her uniform, or placing his hand on various parts of her body. (Testimony of Evelyn Priest, Richard Wyckoff, and Rose Mariani).

Ms. Priest told Rotary on numerous occasions that his conduct was distressful and upsetting to her, told him "... keep your hands off...." and said to him, "Would you please stop this." (Testimony of Evelyn Priest).

6. On June 2, 1978, defendant Rotary exposed his genitals to plaintiff Priest and Rose Mariani as they were having a cup of coffee following the end of Ms. Priest's shift. Defendant did so by quickly pulling down his pants in such a way that plaintiff and Rose Mariani could see his genitals. (Testimony of Evelyn Priest and Rose Mariani). Plaintiff Priest's and Rose Mariani's testimony is partially corroborated by a police report which they filed with the Eureka Police Department after plaintiff was terminated from employment by defendant. (Defendant's Trial Exhibit D3P).

7. Ms. Priest experienced substantial and enduring emotional distress as a direct result of Rotary's conduct described in paragraphs 5 and 6 above. Plaintiff testi-fied, and the Court finds credible, that she found this conduct to be wholly unwelcome and that it caused her to worry about defendant being near her during work. Further, plaintiff testified that she went out of her way to avoid defendant during her employment, but nonetheless the conduct persisted and increasingly caused emotional distress to plaintiff.

8. Throughout the relevant time period in this action, defendant consistently fondled Mary Durina, another waitress at the Fireside, who was engaged in a consensual sexual relationship with the defendant. This conduct occurred during business hours, on the Fireside premises, and was observed by plaintiff and by other nonparty witnesses. (Testimony of Evelyn Priest, Jerry Irving, Gwen Irving, Richard Wyckoff, Rose Mariani and Sandra Conatser).

9. Defendant Rotary subjected female employees other than Evelyn Priest to acts of sexual harassment. His conduct towards these other waitresses was known to Evelyn Priest and affected her work environment. During plaintiff's employment by defendant in 1978, defendant Rotary also fondled Jayne Goodwin who worked in the Fireside office and, on another occasion, made a sexually suggestive comment to her about her breasts. Ms. Goodwin told plaintiff of these incidents, and quit her employment as a result of defendant's conduct, because she "was worried that that type of behavior would continue." (Testimony of Jayne Goodwin and Evelyn Priest). On other occasions, Rotary circulated an obscene photograph of a small child to Fireside waitresses (Testimony of Gwen Irving) and wore a T-shirt stating, "I gagged Linda Lovelace." (Testimony of Sandra Conatser, Dixie Lee Chase, and Evelyn Priest). The Court finds that defendant did wear the T-shirt in plaintiff's presence after January 18, 1978, as plaintiff testified.

10. In April 1978, defendant Rotary fired Rose Mariani from her employment as a waitress at the Fireside because of her negative reaction to an incident in which defendant Rotary grabbed and kissed her

while she was carrying a tray full of dirty dishes. The incident and Ms. Mariani's termination were known to plaintiff Priest and substantially affected plaintiff's working conditions. (Testimony of Rose Mariani and Evelyn Priest).

11. The Court finds that the above-described incidents were unwelcome to plaintiff and were so pervasive and extreme as to alter plaintiff's conditions of employment and create for her an offensive and intimidating working environment. Such incidents were not isolated or trivial. The Court also finds that certain Fireside waitresses, specifically Sandra Conatser, Vicki Powell Defouri and Mary Durina did not object to defendant's conduct. To the contrary, several ex-employees described the Fireside as a "good place to work." (Testimony of Conatser, Priest, Rotary, Mariani, Wyckoff, Gwen Irving, Roberts, DuMond, Chandler, and Bullard).

12. In addition to the incidents described in paragraphs 4 through 10, the Court finds that defendant Rotary sexually harassed and molested plaintiff Priest on separate and different occasions occurring outside of the course and scope of her employment at the Fireside. On one occasion, when plaintiff was patronizing the Fireside Lounge as a customer, defendant Rotary physically picked her up, carried her in his arms across the crowded lounge almost to the entrance of the cocktail lounge, and directed sexually suggestive and offensive remarks about her to the patrons in the lounge. (Testimony of Evelyn Priest). On another occasion, on February 14th or 15th, 1978, Mr. Rotary lowered his pants in the Fireside Coffee Shoppe and exposed his undershorts which were covered with red hearts, to a number of Fireside employees and patrons. On this occasion, Ms. Priest was present as a customer, immediately following her work shift. (Testimony of Gwen Irving, Jerry Irving, Rose Mariani, and Evelyn Priest).

13. The Court finds that George Rotary advantaged those female Fireside employees who reacted favorably to his sexual advances and other conduct of a sexual nature and disadvantaged those employees, including plaintiff Priest, who reacted unfavorably to his conduct. Specifically, the Court finds that defendant advantaged Mary Durina, his consensual sexual partner, by giving her preference in shift and station assignments, which enabled her to earn substantially better tips than plaintiff Priest. (Testimony of Gwen Irving and Evelyn Priest). Ms. Durina was also afforded preferential vacation benefits, was permitted to socialize in the Lounge, against what defendant claimed was a Fireside policy, and was excused from sidework and clean-up duties. (Testimony of Gwen Irving and Rose Mariani). Additionally, defendant assigned Vicki Powell Defouri and Sandra Conatser to work in the dining room, which afforded better tips than the Coffee Shoppe, because they did not react negatively to his conduct. This conduct included an incident observed by Richard Wyckoff in which defendant Rotary fondled Ms. Conatser. Additionally, Ms. Conatser was permitted to socialize in the Lounge, despite Mr. Rotary's purported employee policy to the contrary. (Testimony of Richard Wyckoff). In contrast, defendant Rotary subjected plaintiff Priest to job detriment, including assignment to the low-tipping coffee shop, exclusion from the Lounge, hostility and abuse, and finally, termination of her employment. The Court specifically finds that this difference in treatment was based on employees' reaction to Mr. Rotary's conduct, as described in paragraphs 4 through 11 and hereinabove.

14. Defendant George Rotary terminated plaintiff's employment on June 23, 1978, because of her unfavorable reaction to his sexually suggestive and offensive conduct. The defendant articulated five purportedly legitimate nondiscriminatory reasons for plaintiff's termination: (1) that she failed to do her "sidework"; (2) that she was a poor waitress; (3) that she used "bad language"; (4) that she did not get along with other waitresses; and (5) that she violated defendant's policy forbidding Fireside employees from socializing in the Lounge. The Court finds that each and every one of

these purportedly legitimate nondiscriminatory reasons is pretextual.

15. The Court finds that the testimony of defense witnesses Joan Palermo, Vicki Powell DeFouri, Sandra Conatser, Pauline Roberts, and Robert Goff regarding plaintiff's job performance was not credible for the reasons set forth below.

The evidence at trial demonstrated that Ms. Palermo had close personal and financial ties to the defendant. Furthermore, while testifying, she repeatedly contradicted her former deposition testimony, the testimony of other defense witnesses, and defendant's documentary evidence. Finally, Mr. Rotary testified that during 1978 Ms. Palmero was a heavy drinker and would drink throughout the day at the Fireside. This testimony casts serious doubt on Ms. Palermo's ability to observe or to recall accurately the events as to which she testified.

Defense witness Pauline Roberts identified a spectator in the courtroom as being Evelyn Priest and then testified that she recalled plaintiff's poor performance as a waitress. The Court finds this testimony to be unreliable and affords it no weight.

Employee time records introduced by the defendant, and cross-examination testimony, revealed that Ms. Conatser and Mr. Goff each worked only two shifts with the plaintiff during the entire course of her employment. (Defendant's Exhibits DIC–1 and DIG–1; testimony of Sandra Conatser). Additionally, cross-examination of Ms. Conatser and Vicki Powell Defouri revealed that Conatser had close personal ties to the defendant, was in his debt, and had detailed conversations regarding defendant's contentions in this action with defendant Rotary, as well as with Mary Durina and Vicki Powell Defouri.

Ms. Defouri admitted on cross-examination that she had met many times with defendant, Ms. Conatser, Ms. Durina, Ms. Palermo, and defendant's attorneys to discuss defendant's defenses in this lawsuit and their proposed testimony in that defense, which casts doubt on the veracity of their testimony. These witnesses' demeanor further undermined their credibility. Finally, Ms. Defouri contradicted her deposition testimony during her trial testimony and admitted on cross-examination that she had a strong personal animosity towards plaintiff Priest and that she had received financial assistance from defendant Rotary in 1983 while this action was pending.

16. In contrast, the Court finds credible the testimony of witnesses Gwen Irving, Jerry Irving, and Richard Wyckoff that plaintiff performed her job as a waitress satisfactorily. The Court also finds that the fact that defendant Rotary permitted Sandra Conatser, Robert Goff, Dennis Wyckoff, Joan Palermo, Pauline Roberts, and Mary Durina to frequent the Lounge without censure reveals as pretext defendant's contention that plaintiff was terminated for violating the Lounge policy. (Testimony of Gwen Irving, Joan Palermo, Sandra Conatser, Robert Goff, Pauline Roberts, Evelyn Priest and George Rotary.)

17. On June 23, 1978, when defendant Rotary terminated plaintiff's employment, he forbade her from returning to the Fireside premises. On June 24, 1978, plaintiff Priest returned to the Fireside for the purpose of returning her uniform and talking to defendant about the reason he had fired her. While she was waiting for Mr. Rotary to appear, he came up behind her where she was sitting at the bar, hit her on the shoulder with his open hand and said to her, "You don't listen too well, do you, lady, but I bet you will tomorrow." (Testimony of Evelyn Priest).

18. During the time period of plaintiff's employment with the defendant, plaintiff had an abdominal disorder of which defendant Rotary was aware. During this same time period, defendant Rotary was also aware that plaintiff was the sole source of financial support for her minor son. Further, Rotary knew that plaintiff had bought a car and furniture and rented an apartment in reliance on the fact of being employed at the Fireside. Plaintiff testified that she told defendant she wanted a job the whole year round (as opposed to the busy season only) and that defendant said

she would be able to do so because Ms. Durina wanted to cut down on her hours.

After plaintiff's termination from employment by defendant, plaintiff testified that her state of mind increasingly deteriorated. Ms. Priest testified that the financial effect on her of losing her job was eventually to file for bankruptcy. As her financial problems mounted, she experienced continuing stress and anxiety, particularly focused on her concern as to encountering defendant Rotary. Plaintiff testified that she was constantly in fear that she might run into Rotary and that on the two occasions when she did encounter him, it bothered her immensely. Plaintiff testified that her distressed state of mind actually increased over time, causing continual sleeplessness, upset and worry. She testified that these conditions persisted for many months in an acute state and that these conditions continued to affect her on the job she held at the time of her testimony. This testimony was corroborated by Vera Johnson.

19. The Court finds defendant Rotary inflicted upon plaintiff Priest highly unpleasant mental reactions, including fright, humiliation, shock, surprise, sickness, nervousness, apprehension, disgust, emotional pain, intimidation, embarrassment, anger, worry, substantial sleeplessness, nausea and anxiety. (Testimony of Evelyn Priest and Vera Johnson).

20. The Court finds that defendant Rotary's conduct consisted of more than mere insults, indignities, threats, annoyances, petty oppression or other trivialities. The Court finds that the conduct of defendant Rotary was of an extreme and outrageous nature, such that his conduct went beyond the bounds of decency, and no reasonable person could be expected to endure it. (Testimony of Evelyn Priest and Vera Johnson).

21. The Court finds that defendant Rotary abused his position in relationship to plaintiff Priest as her employer, which gave Rotary an actual or apparent authority over plaintiff Priest and power to affect her interests. (Testimony of Evelyn Priest,

Gwen Irving, Jerry Irving, Rose Mariani and Richard Wyckoff). It is undisputed that defendant had such authority over plaintiff. (Testimony of George Rotary).

22. The Court finds that plaintiff Priest was peculiarly susceptible to emotional distress by reason of her abdominal condition and by reason of her economic condition. (See Finding 18 above, incorporated by this reference, including the testimony cited therein.)

23. The Court finds that defendant Rotary acted in conscious disregard of the high probability of causing emotional distress to plaintiff Priest in that he knew, or should have known, that there was a high degree of probability that emotional distress would result to plaintiff Priest from his conduct and Rotary acted in conscious disregard of those probable results.

24. The Court further finds that, though defendant Rotary intended to do the acts which caused emotional harm to plaintiff, he did not intend the consequences of his acts, which included emotional distress to plaintiff Priest. Defendant Rotary did not act with specific intent to cause harm to plaintiff Priest. He did not harbor feelings of personal spite or ill will toward Ms. Priest, nor did Rotary act with a preconceived design to inflict injury of any kind on plaintiff Priest.

25. The Court finds that the extreme and outrageous conduct of defendant Rotary was the actual and proximate cause of plaintiff Priest's emotional distress.

26. The Court finds that the extreme and outrageous conduct of defendant Rotary was not privileged, and that defendant Rotary did not in good faith believe that he was acting under a legal right.

27. The Court finds that defendant Rotary subjected plaintiff Priest to unlawful and offensive touching.

28. The Court finds that defendant Rotary intended to batter plaintiff Priest but that defendant did not have the specific intent to cause any harm to plaintiff Priest resulting from his assault and battery of her.

29. The Court finds defendant Rotary did not act with the specific intent to cause injury to plaintiff Priest, nor with personal spite, nor with ill will toward her, by reason of his assault and battery of her. The Court further finds that defendant Rotary did not act with a preconceived design to inflict injury of any kind on plaintiff Priest by reason of his battery.

30. The Court finds that defendant Rotary intentionally confined, restrained, and detained plaintiff Priest without her consent and without lawful privilege, for an appreciable length of time on two occasions. The Court further finds that such conduct compelled plaintiff Priest to stay and compelled her to be moved against her will.

31. The Court finds that the restraint constituting false imprisonment of plaintiff Priest by defendant Rotary found in Finding No. 30 above resulted from the exercise of force, and from an express and implied threat of force.

32. The Court finds that defendant Rotary intended to do the acts found in Finding No. 30 which resulted in the false imprisonment of plaintiff Priest.

33. The Court finds that defendant Rotary did not have the specific intent to cause harm to plaintiff Priest by reason of his false imprisonment of her.

34. The Court finds that defendant Rotary did not act with a preconceived design to inflict injury of any kind on plaintiff Priest by reason of his intentional false imprisonment of her. The Court further finds that defendant Rotary did not harbor feelings of personal spite or ill will towards plaintiff Priest by reason of his intentional false imprisonment of her.

35. Defendant's testimony at trial established that he receives $4,000 a month in unearned income from the sale of the Fireside in March 1982, and that he will continue to do so for another twelve years. He owns a large house in Eureka, California in which he holds between $25,000–$27,000 equity. Defendant Rotary owns two other pieces of real property in Humboldt County, and, at the time of trial, held approximately $22,000 to $27,000 in savings. Additionally, defendant Rotary owns a large camper and a personal fishing boat.

The Court further finds that defendant Rotary has been physically and emotionally unable to work since he sold the Fireside in March 1982 and that he provides support to his two daughters and his mother.

36. The Court finds that plaintiff Priest worked a total of sixty-four (64) days at the Fireside from January 1978 until her termination on June 23, 1978. This Finding is based on the weight of the evidence presented by the testimony of Joan Palermo, Jayne Goodwin, and Robert Goff, which showed the Fireside time records were not accurately kept. Additionally, plaintiff's testimony that she worked in February, which work is included in the finding that she worked a total of 64 days, is corroborated by her presence after her shift on the night when defendant pulled his "Valentine's Day prank," which occurred either on Valentine Day or the day after. (Testimony of Evelyn Priest, Gwen Irving, and Jerry Irving).

37. The Court finds that plaintiff earned an average of Twenty-seven ($27.00) Dollars per night in tips during her employment at the Fireside, where it was uncontroverted that she was almost exclusively assigned as a waitress in the coffee shoppe. Therefore, during the period of plaintiff's employment from January through June 23, 1978, the plaintiff earned approximately $1,728.00 in tips.

38. As found above, plaintiff was initially hired as a regular cocktail waitress in the Fireside Lounge, where tips averaged $62.50 a shift. (Testimony of plaintiff and Gwen Irving to the effect that in the lounge weekday tips averaged between $55.00 and $60.00 per shift and weekend tips averaged $70–$80.00.)

39. The Court finds that plaintiff would have worked a full 70 days from the date of her hire in mid-January through June 1978 had she not been wrongfully terminated on June 23 of that year. The Court further finds that plaintiff was unavailable

for work and did not work during the months of March and April 1978, when she was on disability leave for foot surgery.

40. The Court finds that plaintiff was removed from her initial position as a regular cocktail waitress in the Fireside Lounge because of her refusal to wear sexually suggestive attire.

41. The Court finds that had plaintiff retained her position as a cocktail waitress she would have earned a total of approximately $4,375.00 in tips (this is 70 days of employment at $62.50 per day, see paragraphs 38 and 39 above). Therefore, plaintiff experienced a wage loss from January through June 1978 of $2,647.00. (That is, $4,375 minus actual earnings of $1,728).

42. The Court finds that had plaintiff not been wrongfully terminated from her employment on June 23, 1978, she would have worked approximately 20 days per month during the months of July, August, September, October, and November, 1978 up to the time of foot surgery in late November 1978. During this time period, therefore, plaintiff would have earned in the Fireside Lounge approximately $6,250.00 ($62.50 times 20 days times 5 months). In addition to these tip earnings, plaintiff also would have been paid minimum wage for the months of July through November 1978. The uncontroverted testimony at trial was that in 1978 minimum wage was $2.85 per hour. During July through November 1978, plaintiff would have worked 63 days of 8 hour days at minimum wage, or $1,436, plus $6,250 in tips for a total potential earnings at the Fireside Lounge of $7,686.00.

The Court finds on the basis of plaintiff's testimony that from July through November 1978, plaintiff Priest earned only approximately $740.00.

Therefore, the Court finds that plaintiff Priest suffered a wage loss during the period of July through November 1978 of $6,946.00. (That is, $7,686 minus actual earnings of $740.00.)

43. The Court finds there is no credible evidence to believe that plaintiff failed to mitigate her damages by seeking and securing employment to the best of her ability after her termination by defendant Rotary. The Court finds that plaintiff did secure alternate employment, on a part-time basis, at The Embers Bar and Restaurant in Eureka, California. Further, the Court finds that this position was only part-time and therefore not comparable employment to that afforded by defendant. (See defendant's Exhibit D3Q, Embers' time cards).

44. The Court finds that plaintiff was unavailable for employment due to disability from the end of November 1978 through November 1979. Plaintiff accrued no rights to backpay during this period of time. From December 1979 through February 1982 plaintiff was available for work and did secure employment, at which she averaged tips earnings of $57.00 per shift.

The Court finds that plaintiff is entitled to backpay for the period December 1979 through February 1982 as follows: Plaintiff would have earned at the Fireside Lounge $62.50 per day times 27 months times 20 days per month or $33,750; plaintiff did, in fact, earn during this time period $57.00 per day times 27 months times 20 days per month or $30,780.00. The difference between these sums is $2,970 which represents the wage loss suffered by plaintiff for that period between her return to work and defendant Rotary's sale of the Fireside Lounge, at which point defendant's liability for backpay ceases. *Slack v. Havens*, 522 F.2d 1091 (9th Cir.1975).

45. Thus, plaintiff's total wage loss from the date of her termination to the termination of calculation of that loss is $12,563.00 ($2,647.00 plus $6,946.00 plus $2,970.00 as detailed above).

46. To the extent that any of the following Conclusions of Law are deemed to be Findings of Fact, they are incorporated herein by reference.

## CONCLUSIONS OF LAW

1. To the extent that any of the foregoing Findings of Fact are deemed to be

Conclusions of Law, they are incorporated herein by reference.

2. This Court has jurisdiction over this case pursuant to 42 U.S.C. section 2000e–5(f), 28 U.S.C. section 1343(3), and the doctrine of pendent jurisdiction. Declaratory relief is authorized by 28 U.S.C. sections 2201 and 2202.

■ 3. Harassment on the basis of sex is a form of sex discrimination which violates Title VII. *Miller v. Bank of America,* 600 F.2d 211 (9th Cir.1979); *Barnes v. Costle,* 561 F.2d 983 (D.C.Cir.1977). Title VII is violated by sexual harassment which creates a hostile, offensive, or intimidating work environment (work environment claim) or by the conditioning of tangible job benefits on acquiescence to requests for sexual favors or other conduct of a sexual nature (job detriment claim). *Katz v. Dole,* 709 F.2d 251 (4th Cir.1983); *Henson v. City of Dundee,* 682 F.2d 897 (11th Cir.1982); *Vinson v. Taylor,* 23 FEP Cases 37 (D.C. Cir.1980).

■ 4. Plaintiff established a *prima facie* case of job detriment by demonstrating that:

(a) she belongs to a protected group (female);

(b) she was subjected to unwelcome sexual harassment;

(c) the harassment complained of was based on sex; and

(d) her reaction to the harassment complained of affected tangible aspects of her employment.

*Henson v. City of Dundee, supra,* 682 F.2d at 909; *Bundy v. Jackson,* 641 F.2d 934, 951 (D.C.Cir.1981).

■ 5. Defendant rebutted the presumption of discrimination that arose upon plaintiff's establishment of a *prima facie* case by articulating purportedly legitimate, non-discriminatory reasons for plaintiff's assignment to the coffee shoppe and for her employment termination. *Katz v. Dole, supra,* 709 F.2d at 255, n. 4, citing *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981).

■ 6. Plaintiff has met her ultimate burden of persuasion that she has been a victim of discrimination in violation of Title VII by showing that defendant's proferred explanation for her assignment and termination were pretextual. *Id.* The preponderance of the evidence shows that Ms. Priest was assigned to the Coffee Shoppe rather than the lounge or dining room and was eventually terminated from her employment because of her negative reaction to defendant's requests for sexual favors and other conduct of defendant of a sexual nature.

■ 7. Title VII is also violated when an employer requires a female employee to wear sexually suggestive attire as a condition of employment. *Marantetle v. Michigan Host, Inc.,* 24 FEP Cases 1665, 1666 (E.D.Mich.1980); *EEOC v. Sage Realty Corp.,* 507 F.Supp. 599 (S.D.N.Y.1981). Plaintiff Priest established a *prima facie* violation of Title VII by demonstrating that defendant Rotary removed her from her full-time, permanent employment as a cocktail lounge waitress because she refused to wear such sexually suggestive dress. Defendant Rotary failed to articulate any legitimate non-discriminatory reason for the imposition of the dress requirement on Ms. Priest. *EEOC v. Sage Realty, supra,* 507 F.Supp. at 607.

■ 8. Title VII is also violated when an employer affords preferential treatment to female employees who submit to his sexual advances or other conduct of a sexual nature, or when, by his conduct or statements, implies that job benefits will be conditioned on an employee's good-natured endurance of his sexually-charged conduct or sexual advances. *Toscano v. Nimmo,* 570 F.Supp. 1197 (D.Del.1983). Plaintiff Priest established such a violation of Title VII by showing that Mary Durina, defendant's consensual sexual partner, was given preference in job assignment to the lounge and dining room, and was permitted to continue in her employment despite her continual sub-standard work performance, rudeness to customers, and violation of the

purported lounge policy. Additionally, plaintiff established violation of Title VII by demonstrating that other female employees, such as Sandra Conatser, who tolerated defendant's conduct, were given preferential assignment to the dining room because of their tolerance of that conduct.

9. An employer also may violate Title VII by subjecting female employees to sexual harassment which creates a hostile, offensive, or intimidating work environment. The creation of such an environment is, in and of itself, unlawful under the Act even in the absence of tangible job detriment. *Henson v. City of Dundee, supra,* 682 F.2d at 901, 902; *Bundy v. Jackson, supra,* 641 F.2d at 943–48. A *prima facie* work environment claim is established by a showing by the plaintiff that:

(a) she belongs to a protected group (female);

(b) she was subjected to unwelcome sexual harassment;

(c) the harassment complained of was based on sex; and

(d) the harassment complained of was sufficiently pervasive so as to alter the conditions of employment and create an abusive working environment.

*Hensen v. City of Dundee, supra,* 682 F.2d at 903–04. Ms. Priest established a *prima facie* case by showing that Rotary grabbed her, touched intimate parts of her body, tried to kiss her, rubbed his body on hers, picked her up and carried her across the bar room, made sexually suggestive comments to and about her in the presence of others which violated her right to privacy, exposed his genitals to her, and subjected other female waitresses to similar treatment, of which plaintiff was aware.

10. If a *prima facie* case is established, the defendant may rebut plaintiff's showing either directly, by proving that the events complained of did not occur, or indirectly, by showing that they were isolated or genuinely trivial. *Katz v. Dole, supra,* 709 F.2d at 1524.

Often it is necessary for a plaintiff in a sexual harassment claim to establish that the employer knew or should have known of the offensive conduct complained of by the plaintiff before liability will be imposed on that employer. *Katz v. Dole, supra,* 709 F.2d at 1524. This issue is not presented in this case because it is uncontroverted that defendant Rotary was the owner of the Fireside, which was not a corporation and therefore he was, personally, plaintiff's employer.

Defendant Rotary failed to rebut plaintiff's *prima facie* case either by showing the events to be trivial, or perpetrated by someone else. Although the evidence revealed that some Fireside waitresses did not object to defendant's conduct, this does not constitute the required showing that the conduct of which plaintiff complained was objectively inoffensive. *Morgan v. Hertz Corporation,* 542 F.Supp. 123, 27 FEP Cases 990 (W.D.Tenn.1981).

Thus, having proven that the acts complained of did occur, and that these were not trivial, and further that they were perpetrated by her employer, plaintiff has established a *prima facie* case. *Katz v. Dole, supra,* 709 F.2d at 1523–24.

11. Under California law, the essential elements of a claim for intentional infliction of emotional distress are:

(a) outrageous conduct by the defendant;

(b) intention to cause, or conscious disregard of the probability of causing, emotional distress;

(c) severe emotional suffering; and

(d) actual and proximate causation of the emotional distress by defendant's outrageous conduct.

*Agarwal v. Johnson,* 25 Cal.3d 932, 946, 160 Cal.Rptr. 141, 603 P.2d 58 (1979); *Newby v. Alto Riviera Apartments,* 60 Cal. App.3d 288, 296–97, 131 Cal.Rptr. 547 (1976); BAJI 12.70. The evidence at trial established that defendant Rotary's conduct towards plaintiff, both within and outside the course and scope of her employment, was outrageous. This conclusion is buttressed by the facts that defendant Rotary knew that plaintiff had an abdominal disorder which was worsened by stress and

that plaintiff counted on her income from defendant to support her minor child. *Agarwal v. Johnson, supra,* 25 Cal. at 946, 160 Cal.Rptr. 141, 603 P.2d 58; *Alcorn v. Anbro Engineering,* 2 Cal.3d 493, 498 n. 2, 86 Cal.Rptr. 88, 468 P.2d 216 (1970). Plaintiff also demonstrated that defendant acted with conscious disregard of the consequences of his actions and that plaintiff suffered severe physical pain and emotional distress actually and proximately caused by defendant Rotary's outrageous conduct. Defendant Rotary is liable to plaintiff Priest for intentional infliction of emotional distress.

12. The emotional distress inflicted by defendant Rotary upon plaintiff consisted of highly unpleasant mental reactions, including fright, humiliation, shock, surprise, sickness, nervousness, apprehension, disgust, emotional pain, intimidation, embarrassment, anger, sleeplessness, nausea, and anxiety.

13. The conduct of defendant Rotary was of an extreme and outrageous nature such that his conduct went beyond the bounds of decency, and no reasonable person could be expected to endure it. Such conduct consisted of more than mere insults, indignities, threats, annoyances, petty oppression or other trivialities.

14. The extreme and outrageous character of the conduct of defendant Rotary arose from abuse of his position in relationship to plaintiff Priest, which gave defendant Rotary an actual or apparent authority over plaintiff Priest and power to affect her interests.

15. The extreme and outrageous character of defendant Rotary's conduct arose further from his knowledge that plaintiff Priest was peculiarly susceptible to emotional distress by reason of her abdominal condition and by reason of her economic condition.

16. Defendant Rotary's conduct was in conscious disregard of the high probability of damaging plaintiff in that he knew, or should have known, that such conduct had a high degree of probability of causing emotional distress, and defendant Rotary acted with a conscious disregard of those probable results.

17. At the time the acts were committed, defendant Rotary did not act with specific intent to cause harm to plaintiff Priest. Defendant Rotary did not harbor feelings of personal spite or ill will toward plaintiff Priest, nor did he act with a preconceived design to inflict injury on her.

18. The extreme and outrageous conduct of defendant Rotary was the actual and proximate cause of plaintiff Priest's emotional distress.

19. The extreme and outrageous conduct of defendant Rotary was not privileged. Defendant Rotary did not, in good faith, believe that he was acting under a legal right, nor was defendant in fact acting under a legal right while engaged in the conduct which caused plaintiff's damages.

20. Under California law, the tort of false imprisonment is defined as the non-consensual, intentional confinement of a person, without lawful privilege, for an appreciable period of time, however short it may be. *Newport Beach v. Sasse,* 9 Cal. App.3d 803, 810, 88 Cal.Rptr. 476 (1970); B. Witkin, *Summary of California Law,* Vol. 4, § 214, p. 2498. The plaintiff must establish that she was deprived of her liberty— forced to remain where she did not wish to be, or go where she did not wish to go. *Onick v. Long,* 154 Cal.App.2d 381, 386, 316 P.2d 427 (1957). Plaintiff Priest established a claim of false imprisonment by proving that defendant Rotary picked her up against her will and carried her across the Fireside Lounge. On a separate occasion, a second false imprisonment occurred when defendant Rotary trapped her between himself and another male Fireside employee, preventing her escape while he fondled her body. Defendant Rotary failed to establish that on either occasion he acted with plaintiff's consent, or that his conduct was privileged. Defendant is liable to plaintiff for two instances of false imprisonment.

21. Defendant Rotary intentionally confined, restrained, and detained plaintiff Priest for an appreciable length of time without her consent and without lawful privilege. Such conduct compelled plaintiff Priest to stay and then be moved against her will.

22. The restraint constituting false imprisonment resulted from the exercise of force and from an express and implied threat of force.

23. Although defendant Rotary intended to do the acts which caused harm to plaintiff, he did not act with specific intent to cause harm to plaintiff Priest. Defendant Rotary did not harbor feelings of personal spite or ill will towards plaintiff Priest nor did he act with a preconceived design to inflict injury of any kind on plaintiff Priest.

24. To establish a claim for battery under California law, a plaintiff must demonstrate that the defendant intentionally subjected her to a harmful or offensive touching which actually and proximately caused plaintiff to suffer injury. *People v. Martinez*, 3 Cal.App.3d 886, 889, 83 Cal.Rptr. 914 (1970); B. Witkin, *Summary of California Law*, Vol. 4, § 194, p. 2483; *Allstate Ins. Co. v. Overton*, 160 Cal.App.3d 843, 206 Cal.Rptr. 823 (1984). Plaintiff established that defendant Rotary subjected her to repeated offensive touchings, which establish his liability for battery under California law. Defendant Rotary intentionally touched plaintiff in ways that actually and proximately caused plaintiff to suffer physical injury by way of physical pain, humiliation, anxiety, and sleeplessness.

25. Defendant Rotary failed to prove that his offensive touchings of plaintiff Priest were done either with her consent or in self-defense, as defendant alleged.

26. Although defendant Rotary intentionally touched plaintiff, he did not act with the specific intent to cause injury to plaintiff Priest, nor with ill will toward plaintiff Priest, nor did he act with a pre-conceived design to inflict injury of any kind on her.

27. Under California law, when a person is injured by the tortious acts of another, she is entitled to recover from the tortfeasor an amount that will compensate for all the detriment proximately caused by the tortious acts. California Civil Code, §§ 3281–3333. Such damages may include compensation to the plaintiff for mental suffering, whether or not it is occasioned by physical pain. *Merrill v. Los Angeles Gas and Electric Co.*, 158 Cal. 449, 512–13, 111 P. 534 (1910). In assessing an award of compensatory damages, the trier of fact should consider the mental worry, grief, distress, and mortification suffered by the plaintiff, as well as her fright, nervousness, anxiety, shock, humiliation, indignity and physical pain. *Deevy v. Tassi*, 21 Cal.2d 109, 120, 130 P.2d 839 (1942). In light of these factors, plaintiff is entitled to receive an award of compensatory damages for battery, wrongful imprisonment and intentional infliction of emotional distress in the amount of $95,000.

28. California Civil Code § 3294 provides that in an action for the breach of an obligation not arising from contract, a plaintiff may be entitled to an award of exemplary damages where the defendant has been guilty of oppression, fraud, or malice. The term "oppression" as it is used in Civil Code § 3294 means "... an act of subjecting a person to cruel and unjust hardship" in conscious disregard of his rights. *Roth v. Shell Oil Co.*, 185 Cal.App.2d 676, 681, 8 Cal.Rptr. 514 (1960); *Trammell v. Western Union Telegraph Co.*, 57 Cal.App.3d 538, 557, 129 Cal.Rptr. 361 (1976). While defendant Rotary did not act with a preconceived design to inflict injury on plaintiff Priest, he acted in a manner which was oppressive within the meaning of Civil Code § 3294.

Further, Civil Code § 3294 defines "malice" as "... conduct which is carried on by the defendant with a conscious disregard of the rights or safety of others." Defendant

Rotary's conduct towards plaintiff comes within this definition as well.

29. The dual purpose of an exemplary damage award under Civil Code § 3294 is to set an example for other potential wrongdoers and to punish a defendant who is guilty of particularly egregious wrongs. Consequently, an assessment of punitive damages should be made in light of the defendant's financial condition. *Bertero v. National General Corp.*, 13 Cal.3d 43, 65, 118 Cal.Rptr. 184, 529 P.2d 608 (1974). The trier of fact should also consider the nature of the defendant's acts and the relationship between the parties. L. Johns, *California Damages Law and Proof* 2d, § 18.4, p. 402 (1977) and citations therein. In light of these principles, and taking into consideration defendant's financial and emotional state, plaintiff is entitled to an award of exemplary damages in the amount of $15,000.00.

30. Plaintiff is entitled to an award of back pay in the amount of $12,563.00, reflecting the amount that plaintiff would have earned but for her discriminatory shift and station assignment and termination by defendant, less any amount she actually earned, until March 1982. Plaintiff's back pay entitlement terminates at that time, when defendant Rotary sold the Fireside. *Slack v. Havens*, 522 F.2d 1091 (9th Cir.1975).

31. Plaintiff is entitled to receive interest on the back pay and compensatory damages awards, calculated from the end of each calendar quarter, on the amount then due and owing, at ninety percent (90%) of the average prime rate for the year in which the calendar quarter occurs. *Richardson v. Restaurant Marketing Associates, Inc.*, 527 F.Supp. 690, 698 (N.D.Cal. 1981); *Fadhl v. City and County of San Francisco*, 553 F.Supp. 38 (N.D.Cal.1982) *rev'd and remanded on other grounds.* The applicable average prime rate figures, as obtained from the Federal Reserve Bank, are as follows: for 1978, 9.06%; for 1979, 12.67%; for 1980, 15.27%; for 1981, 18.87%; for 1982, 14.84%; for 1983, 1079%; for 1984, 12.12%; for 1985, 9.93%.

32. Plaintiff is entitled to her costs of suit, including all reasonable attorneys' fees for representation in this case. Plaintiff is directed to file her motion for costs and fees within sixty (60) days of the date of entry of judgment herein.